UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                        :
UMER FAROOQ,                                            :
                                                        :
                        Plaintiff,                      :
                                                        :              19-CV-6294 (JMF)
            -v-                                         :
                                                        :              OPINION AND ORDER
NEW YORK CITY HEALTH AND HOSPITALS                      :
CORPORATION et al.,                                     :
                                                        :
                        Defendants.                     :
                                                        :
------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

    Plaintiff Umer Farooq brings a litany of employment-related claims against his employer,

the New York City Health and Hospitals Corporation ("H+H"); its Chief Executive Officer,

Eboné Carrington; and one of his superiors, Hinnah Farooqi.  Farooq's claims fall into four

general categories: (1) procedural and substantive due process claims under the Fourteenth

Amendment, brought pursuant to 42 U.S.C. § 1983; (2) a claim for retaliation in violation of the

First Amendment of the United States Constitution, also brought pursuant to Section 1983, and a

similar retaliation claim under the New York State Constitution; (3) discrimination-related

claims, including (a) claims of disparate treatment, hostile work environment, and retaliation on

the basis of nationality and religion, in violation of Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e-2 *et seq.* and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981;

and (b) discrimination on the basis of age in violation of the Age Discrimination in Employment

Act ("ADEA"), 29 U.S.C. § 621 *et seq.*; and (c) analogous claims under New York and New

York City law; and (4) administrative claims under state and city law.  Defendants now move,

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the lawsuit in its

entirety.  For the reasons discussed that follow, Defendants' motion is granted.

## BACKGROUND

The following facts — which are taken as true and construed in the light most favorable

to Farooq — are drawn from the Second Amended Complaint ("Complaint"), from documents

attached to the Complaint, statements or documents incorporated into the Complaint by reference

or relied upon so heavily as to be "integral" to the Complaint, and matters of which judicial

notice may be taken.  *See, e.g.*, *Empire Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d

132, 139 (2d Cir. 2018); *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

Farooq, a Muslim, Pakistani-born man, has been employed by H+H since 2006, when he

joined the pharmacy staff at Harlem Hospital Center.  *See* ECF No. 53 ("Complaint" or "SAC"),

¶¶ 10-13, 17.  Around 2010, Farooq was promoted to Level III Clinical Pharmacist.  *See id.* ¶ 18.

In that role, which he still technically occupies, Farooq is responsible for various pharmacy-

related activities, such as "daily drug monitoring"; ensuring "compliance with regulatory,

accrediting, and government agency standards and laws, [and] national patient safety goals"; and

"engaging in quality improvement activities to meet departmental needs and Joint Commission

(TJC) standards."  *Id.* ¶ 19.  Farooq's specialty is "in the Adult Intensive Care Unit (AICU),"

where he is "specifically tasked with medication management, including compliance with all

regulatory, accrediting, and government agency standards and laws."  *Id.* ¶ 20.  He is "not

responsible for affirmatively identifying or removing expired medication from active pharmacy

stock."  *Id.* ¶ 21.

In January 2019, several Pakistani pharmacists, including Farooq, filed complaints with

H+H's Equal Employment Office ("EEO") alleging that Defendant Farooqi, the Associate

Executive Director of Harlem Hospital Center, *see id.* ¶ 15, had been discriminating based on

national origin, religion, and age, *see id.* ¶ 63.  Farooq "complained of discriminatory hiring practices as well as a hostile and demeaning work environment for older Pakistani, Muslim pharmacists." *Id.* ¶ 64.  On April 30, 2019, counsel representing "a number of the older Pakistani pharmacists" wrote a letter to Defendant Carrington, the Chief Executive Officer and Chief Operations Officer of H+H, regarding their concerns about "Farooqi's discriminatory practices." *See id.* ¶ 65.  The Complaint alleges that Farooqi "promoted a number of younger, non-Pakistani pharmacists to become Level III supervisors over senior pharmacists of Pakistani origin," *id.* ¶ 67; that Farooq and his colleagues "received lower performance evaluations" after Farooqi became Associate Executive Director, *id.* ¶ 73; *see id.* ¶ 74-75 (noting that Farooq "had previously received performance evaluations of 'outstanding,'" but, in June 2018, he received an evaluation of "satisfactory," on the instruction of "higher level management"); and that Farooqi was "very derogatory," "use[d] abusive language," and "insult[ed]" people, *id.* ¶ 76.  Once, in response to Farooq's complaint regarding the way that a non-Pakistani pharmacist was treating him, Farooqi "mocked his spelling errors" instead of addressing the issue.  *Id.* ¶ 78.  Farooqi also denied Farooq's and the others' requests for religious accommodations.  *See id.* ¶¶ 79-80.

On February 22, 2019, Farrukh Zaman, the official supervising pharmacist and Assistant Director of the Pharmacy Department was "effectively forced to retire" because Farooqi "repeatedly undermined his responsibilities and position within the Department." *Id.* ¶ 87.  After Zaman's retirement, Farooqi "assumed the role of supervisor to a number of Dr. Farooq's colleagues," *id.* ¶ 90, and named Hans Go, a non-Pakistani man, as Farooq's supervisor, *see id.* ¶ 92.  On May 8, 2019, Go "chastised" Farooq for using sick days — sick days that he were "authorized to take." *Id.* ¶ 92.  On May 13, 2019, Farooq "was suddenly assigned as a 'Clinical Supervisor of the Day' once a week in the Inpatient Main Pharmacy," which "resulted in a substantial diminution in his job duties in . . . critical care." *Id.* ¶ 93.

In November 2018, Farooq noticed that there was "expired medication . . . within the pharmacy that could put patients at risk" and began to alert his supervisors. *Id.* ¶ 22. He also "suggested ways to identify and remove expired medication." *Id.* ¶ 24. On May 14, 2019, Farooq's supervisor, Go, instructed him to "take the lead on making sure that the AICU was compliant with medication management standards, including checking that medications on hand had not expired." *Id.* ¶ 25. Three days later, Farooq sent an email to several of his colleagues, including Go and Farooqi, "informing them that he had located [a] number of expired lifesaving intravenous medications in the AICU section of the pharmacy" and "mentioned prior findings" of expired medications by "other pharmacy technicians" in a variety of departments and units within the hospital. *Id.* ¶ 28. In the email, Farooq noted that, because of the expired medication, the pharmacy department was out of compliance with Joint Commission standards. *See id.* ¶ 29. Farooq "had been notifying supervisors of the expired medications for several months but continued to find expired medications in active stock." *Id.* ¶ 31.

Two days later, Go removed Farooq from the email list regarding expired medication and informed Farooq that he should "focus [on] ensuring compliance for the ICU when assigned in ICU." *Id.* ¶ 33. Farooq also answered questions posed by Go regarding why the pharmacy was not in compliance and how it could achieve compliance. *See id.* ¶ 37. On May 23, 2019, Farooqi told Farooq that he had "offer[ed] no solution and/or assistance." *Id.* ¶ 38. On May 30, 2019, Farooq again wrote an assessment regarding the causes of noncompliance, how to achieve compliance, and who was responsible. *See id.* ¶ 39. Farooqi responded by "disregard[ing] his assessment of the issues" and instead "focusing on his communication style." *Id.* ¶ 40.

On June 3, 2019, Farooq was instructed to relinquish his keys to the clinical pharmacists' shared office but was not told why. *Id.* ¶ 41. A less senior, non-Pakistani clinical pharmacist was not asked to return his keys. *Id.* On June 7, 2019, after Farooq again "alert[ed] his

supervisors to continued issues with expired medication," he was "provided with a written 'counseling' notice for 'unprofessional communication to administration.'" *Id.* ¶ 42.  A few days later, Go instructed Farooq to perform "medication management rounds for the entire hospital," and Farooq did so.  *See id.* ¶¶ 44-45.  On June 21, 2019, Farooq "found medication incorrectly located in an unlabeled bin" while conducting a "medication management compliance search," photographed the medication "as instructed by his supervisors," "requested the appropriate medication," and "placed the appropriate medication in the appropriate bin."  *Id.* ¶¶ 47-49.

H+H regulations provide that "[p]ending [a] hearing and determination of charges of incompetency or misconduct, the employee against whom such charges have been []referred may be suspended without pay for a period not exceeding thirty days."  *Id.* ¶ 58.  The regulations also require that an employee recommended for removal or disciplinary action be given notice and explanation of the charges.  *See id.* ¶ 59.  In a meeting later on June 21, 2019, Farooq was given a pre-hearing suspension letter, which stated that because of "an alleged act of misconduct that occurred on or about June 21, 2019," he would be "on pre-hearing suspension without pay until further notice, effective June 24, 2019."  *Id.* ¶ 51.  During the meeting, Farooq was asked about "the existence of expired medications," "allegedly accessing unauthorized information about medication," an "alleged text message Dr. Farooq sent" related to Farooqi, and a flier he had allegedly distributed in which he called Farooqi "the 'devil.'"  *Id.* ¶¶ 53-55.  After the meeting, Farooq was escorted from the premises by hospital police, in front of his colleagues.  *See id.* ¶ 57.  Carrington was emailed about "the repeated discriminatory conduct" that day.  *See id.* ¶¶ 102-03.  Farooq's pay was later reinstated.  *See id.* ¶ 61.

On July 1, 2019, Farooq filed charges with the Equal Employment Opportunity Commission ("EEOC"), *see id.* ¶ 84, and he filed this lawsuit on July 8, 2019, *see* ECF No. 1.  On July 15, 2019, Farooq received a notice and statement of four charges against him in

connection with his suspension, namely that: (1) in November 2018, he had taken photos of a supervisor in the pharmacy without authorization; (2) on February 11, 2019, he had sent threatening and intimidating messages and photos to Farooqi's cell phone; (3) on February 15, 2019, Farooq had "engaged in threatening and intimidating behavior" when he stated something to the effect of "watch and see what will happen to Dr. Farooqi today" to another member of the pharmacy staff; and (4) on June 27, 2019, Farooq had entered the hospital without authorization while on suspension. SAC ¶ 95. On November 8, 2019, the EEOC issued Farooq a Notice of Right to Sue, *see id.* ¶ 6, and Farooq amended his complaint on November 29, 2019. At the time that the present motion to dismiss was filed, Farooq remained suspended, but with pay. *See* ECF No. 63 ("Reply"), at 2 n.1. He was scheduled to return to work on March 9, 2020. *See id.*

## LEGAL STANDARDS

In evaluating Defendants' motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all facts set forth in the Complaint as true and draw all reasonable inferences in Farooq's favor. *See, e.g.*, *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). A claim will survive a Rule 12(b)(6) motion, however, only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). A plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully," *id.*, and cannot rely on mere "labels and conclusions" to support a claim, *Twombly*, 550 U.S. at 555. If the plaintiff's pleadings "have not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570. Where, as here, a plaintiff brings claims of employment discrimination, however, "[t]he facts required by *Iqbal* to

be alleged in the complaint need not give plausible support to the ultimate question of whether

the adverse employment action was attributable to discrimination.  They need only give plausible

support to a minimal inference of discriminatory motivation." *Littlejohn v. City of New York*,

795 F.3d 297, 311 (2d Cir. 2015); *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d

72, 86-87 (2d Cir. 2015).

## DISCUSSION

Farooq brings thirteen claims, but, as noted, they fall into four general categories:

(1) claims for violations of his due process rights; (2) a claim for retaliation in violation of his

right to free speech; (3) claims for discrimination on the basis of ethnicity, religion, and age, and

related claims of retaliation; and (4) administrative claims under the laws of New York State and

New York City.  The Court will address each category of claims in turn.

### A.  Due Process

First, Farooq alleges a violation of his procedural and a substantive due process rights

under the Fourteenth Amendment of the United States Constitution.  *See* SAC ¶¶ 104-17.  In

order to state either claim, a plaintiff must, in the first instance, identify a liberty interest or a

"constitutionally protected property interest" of which he or she has been deprived.  *Baron v.

Port Auth. of N.Y. & N.J.*, 271 F.3d 81, 89 (2d Cir. 2001) (affirming dismissal of a procedural

due process claim because the plaintiff had failed to identify "a constitutionally protected

property interest"); *see, e.g.*, *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995)

("The first step in substantive due process analysis is to identify the constitutional right at

stake."); *see also Maragh v. Roosevelt Island Operating Corp.*, No. 16-CV-7530 (JMF), 2018

WL 6573452, at *4 (S.D.N.Y. Dec. 13, 2018) (dismissing a substantive due process claim

because the plaintiff had "fail[ed] to establish the existence of a constitutionally protected

property interest" (internal quotation marks omitted)).

Farooq fails to do so.  The Second Circuit has intimated, and courts in this district routinely hold, that no property interest is implicated when a public employee is suspended with pay, as Farooq is here.  *See O'Connor v. Pierson*, 426 F.3d 187, 196 (2d Cir. 2005) ("[N]o court has held that an employee on fully paid leave has been deprived of a property right merely by virtue of being relieved of his job duties.  Indeed, such a position would seem to run afoul of *Loudermill* [*v. Cleveland Board of Education*, 470 U.S. 532, 544-45 (1985)], which observed that a state employer, wishing to terminate an employee immediately without providing the pre-termination hearing that due process requires, may suspend the employee without pay."); *Adams v. N.Y. State Educ. Dep't*, 752 F. Supp. 2d 420, 453 (S.D.N.Y. 2010) (collecting authorities for the proposition that "[a]n employee who continues to be paid cannot sustain a claim for deprivation of property without due process even if relieved from job duties" (internal quotation marks omitted)).[1]  And although Farooq was initially suspended without pay, he concedes that H+H later restored to him all wages missed during that period.  *See* Opp'n 5 (noting that "Defendants[] subsequent[ly and] retroactive[ly] reinstate[d] . . . Plaintiff's pay.").[2]

---

[1]     Farooq argues that he was also deprived of a property interest because his "suspension may affect his ability to renew his license and continue to practice his profession."  *See* ECF No. 61 ("Opp'n"), at 5-6.  This interest, Farooq argues, is exacerbated by the length of his suspension, which may impact "future performance evaluations," cause his skills to deteriorate, or result in his replacement.  *Id.* at 6.  The Court need not decide whether any of these interests amount to constitutionally protected property interests, however, because Farooq fails to allege them in the Complaint.  *See O'Brien v. Nat'l Prop. Analysts Partners*, 719 F. Supp. 222, 229 (S.D.N.Y. 1989) ("[I]t is axiomatic that [a c]omplaint cannot be amended by the briefs in opposition to a motion to dismiss.").

[2]     In the alternative, to the extent that Farooq's initial suspension without pay implicated a property interest, any claim relating to it is moot given that his pay was restored.  *See Prins v. Coughlin*, 76 F.3d 504, 506 (2d Cir. 1996) (per curiam) ("A case is deemed moot where the problem sought to be remedied has ceased, and where there is no reasonable expectation that the wrong will be repeated." (internal quotation marks omitted)).

Farooq's substantive due process claim is subject to dismissal for an additional reason.  It is well established that "where a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process."  *Velez v. Levy*, 401 F.3d 75, 94 (2d Cir. 2005).  Here, "[w]hat is allegedly shocking about what the defendants did," *id.*, is that they "initiated disciplinary charges against [Farooq] without requisite notice or an opportunity to be heard," SAC ¶ 113, and "as retaliation for Plaintiff's filing of an internal EEO Complaint alleging discrimination," *id.* ¶ 114.  Because Farooq's due process claim is predicated entirely on his separately alleged claims for violations of the First Amendment and the Equal Protection Clause, it is "subsumed" by those separate claims.  *Velez*, 401 F.3d at 94.

## B.  Free Speech

Next, Farooq alleges that Defendants violated his right to free speech guaranteed by the First Amendment of the United States Constitution.  SAC ¶ 118-20.  In particular, Farooq alleges that he was suspended "because he protested and objected to . . . regulatory noncompliance" at Harlem Hospital Center, which stocked expired medication in its pharmacies.  *Id.* ¶ 119; *see, e.g.*, *id.* ¶¶ 22-24, 27-31; *see also* Opp'n 10-11.

Over half a century ago, the Supreme Court observed that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general."  *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968).  As a result, speech by a public employee is protected under the First Amendment only when the employee is speaking both as a citizen and on a matter of public concern.  *See Ross v. Breslin*, 693 F.3d 300, 305 (2d Cir. 2012).  Public employees do not speak as citizens for First Amendment purposes when they "make statements

pursuant to their official duties," *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006), "even when the subject of an employee's speech is a matter of public concern," *Ross*, 693 F.3d at 305.

In this case, the speech for which Farooq claims he was suspended was plainly made pursuant to his official duties.  Although Farooq alleges that "he is not responsible for affirmatively identifying or removing expired medication from active pharmacy stock," SAC ¶ 21, he also alleges that he was repeatedly instructed to do so.  For example, on May 14, 2019, Farooq's supervisor "informed him that he was to take the lead on making sure that the AICU was compliant with medication management standards, including checking that medications on hand had not expired." *Id.* ¶ 25.  Five days later, Farooq "was told that his efforts should focus on ensuring compliance for the ICU." *Id.* ¶ 33 (alterations and internal quotation marks omitted). He was also "asked to respond to specific questions," including about "why there was non-compliance, what Dr. Farooq did to attempt to resolve the non-compliance, and what the next steps were for the pharmacy team." *Id.* ¶ 36.  And on June 12, 2019, Farooq's supervisor instructed him to perform "medication management rounds for the entire hospital." *Id.* ¶ 44.

Indeed, Farooq's statements fell squarely within his job responsibilities as he himself alleges elsewhere.  Farooq alleges that his job responsibilities include "daily drug monitoring, compliance with regulatory, accrediting, and government agency standards and laws, compliance with national patient safety goals, and engaging in quality improvement activities to meet departmental needs and Joint Commission (TJC) standards." *Id.* ¶ 19.  And he pleads that he was, in fact, ensuring compliance with various standards.  *See id.* ¶ 29 (alleging that he informed various colleagues and superiors that his "findings of expired drugs make [the] department of pharmacy [not in compliance] with the TJC MM standards and Board of [P]harmacy rules"); *id.* ¶ 163 (alleging that he "disclosed and objected to violations of law and regulation, including, *inter alia*, the existence of expired medication in the [AICU] . . . in violation of the Rules of the

Board of Regents of New York State . . . CMS Guidelines . . . and TJC Medication Management

Standard[s]").  Moreover, Farooq did not communicate his concerns through "channels available

to citizens generally," and his speech did not have a "relevant civilian analogue."  *Jackler v.*

*Byrne*, 658 F.3d 225, 238 (2d Cir. 2011).  Instead, Farooq communicated his concerns through

private communications to his superiors in the normal course of his job.  *See Carter v. Inc. Vill of*

*Ocean Beach*, 415 F. App'x 290, 293 (2d Cir. 2011) (summary order) ("Plaintiffs' allegations

establish no more than that they reported what they believed to be misconduct by a supervisor up

the chain of command — misconduct they knew of only by virtue of their jobs as [public

employees] and which they reported as part-and-parcel of their concerns about their ability to

properly execute their duties" (alterations and internal quotation marks omitted)).

   *Jackler*, upon which Farooq relies, is readily distinguishable.  There, the Second Circuit

held that the First Amendment protects a police officer's refusal to retract a truthful statement

made in the course of an investigation regarding excessive force used by a fellow police officer.

*See Jackler*, 658 F.3d at 240-42.  But the speech at issue in *Jackler* had a civilian analogue — a

citizen complaint.  *Id.* at 241.  Indeed, the plaintiff's speech corroborated a similar report made

through the same channels by an ordinary citizen.  *See id.* at 231 (noting that the plaintiff's report

"corroborated [a] civilian complaint").  Additionally, the Second Circuit expressly stated that its

holding did not allow "any employee who simply files a truthful report [to] claim that his [or her]

First Amendment rights were implicated because he [or she] did not file a false one."  *Id.* at 241.

Instead, the court relied upon the defendants' "repeated[] attempt[s] to force [the plaintiff] to

withdraw the truthful report he had filed and to submit one that was false."  *Id.*  Those

background circumstances are absent here.  Thus, permitting Farooq's claim would amount to

the scenario that the Second Circuit rejected.  *See Ross*, 693 F.3d 300, 307-08 (distinguishing

*Jackler* because the plaintiff "alleges that she suffered retaliation for making affirmative

statements of misconduct to her supervisors, not for refusing to make false statements that no misconduct had occurred"); *D'Olimpio v. Crisafi*, 462 F. App'x 79, n.1 (2d Cir. 2012) (summary order) ("*Jackler*'s reasoning does not extend to this quite different factual context, where the employee engaged in speech mandated by law as a duty of his job.").

## C. Federal Discrimination, Hostile Work Environment, and Retaliation Claims

Farooq also asserts a variety of claims for disparate treatment, hostile work environment, and retaliation on the basis of national origin and religion in violation of Title VII, *see* SAC ¶¶ 121-34, discrimination on the basis of race or ethnicity in violation of Section 1981, *see* SAC ¶¶ 135-37, and discrimination on the basis of age in violation of the ADEA, *see* SAC ¶ 138-40. The Section 1981 claims require little discussion, as it is well established that the statute provides no remedy against state actors.  *See, e.g.*, *Duplan v. City of New York*, 888 F.3d 612, 619 (2d Cir. 2018) (reaffirming that "the express cause of action for damages created by § 1983 constitutes the *exclusive federal remedy* for violation of the rights guaranteed in § 1981 by state governmental units" (quoting *Jett v. Dallas Ind. Sch. Dist.*, 491 U.S. 701, 733 (1989)). Accordingly, the Court "will construe" that claim "as being brought pursuant to [Section] 1983." *Brown v. Baldwin Union Free Sch. Dist.*, 603 F. Supp. 2d 509, 517 n.5 (E.D.N.Y. 2009).  With that, the Court will turn to the substance of Farooq's claims.

### 1. Disparate Treatment

Discrimination claims brought under Title VII, Section 1983, and the ADEA are all evaluated under the three-step burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See, e.g.*, *Annis v. Cty. of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998) (Title VII and Section 1983); *Watson v. Geithner*, No. 11-CV-9527 (AJN), 2013 WL 5441748, at *4 (S.D.N.Y. Sept. 27, 2013) (ADEA).  At the motion-to-dismiss stage, only the first step of the burden-shifting framework — the plaintiff's burden to allege a *prima facie* case

of discrimination — is at issue.  *See Littlejohn*, 795 F.3d at 311.  Each statute at issue requires a plaintiff to show that: (1) he was a member of a protected class; (2) he was competent to perform the job in question or was performing the duties satisfactorily; (3) he suffered a materially adverse employment action; and (4) the action occurred under circumstances that give rise to an inference of discrimination.  *See, e.g.*, *Spiegel v. Schulman*, 604 F.3d 72, 80 (2d Cir. 2010) (per curiam).  To survive a motion to dismiss under all of the provisions at issue in this case, the facts alleged must provide "at least minimal support for the proposition that the employer was motivated by discriminatory intent."  *Littlejohn*, 795 F.3d at 311.

Although "the burden of establishing a *prima facie* case is 'minimal,'" *Smith v. N.Y. & Presbyterian Hosp.*, 440 F. Supp. 3d 303, 328 (S.D.N.Y. 2020) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)), Farooq fails to meet it.  As an initial matter, Farooq only vaguely identifies the employment actions that allegedly give rise to his claims.  *See* SAC ¶ 126 (alleging that Defendants "discriminated against plaintiff . . . by the conduct described in this complaint including, but not limited to, suspending Plaintiff without pay after he complained of discrimination").  Many of the actions about which Farooq complains are, as a matter of law, not materially adverse.  For example, Farooq alleges that Farooqi discriminated against him by responding to an email regarding "his assessment of the non-compliance in the pharmacy, how to achieve compliance, and who was in charge of achieving compliance" by "disregard[ing] his assessment of the issues in the pharmacy" and instead "focusing on his communication style rather than the substance of the issues he raised."  SAC ¶¶ 39-40.  That does not qualify as a materially adverse employment action under Title VII, Section 1983, or the ADEA.  *See, e.g.*, *Weeks v. N.Y. State (Div. of Parole)*, 273 F.3d 76, 85 (2d Cir. 2001) ("An adverse employment action is a materially adverse change in the terms and conditions of employment." (internal

13

quotation marks omitted)), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002).

Farooq also alleges that in June 2018 his performance was rated only "satisfactory" at the direction of "higher level management," even though he had "previously received performance evaluations of 'outstanding.'"  SAC ¶ 73-75.  Assuming for the sake of argument that claims arising out of that incident are timely — the Court has its doubts — Farooq's satisfactory performance evaluation, without more, does not qualify as a materially adverse employment action.  *See Moy v. Perez*, 712 F. App'x 38, 41 (2d Cir. 2017) (summary order) ("Given that [the plaintiff's] evaluation was still positive (albeit less positive than in previous years), neither the evaluation nor the circumstances surrounding its issuance plausibly make out an adverse employment action."); *Tepperwien v. Entergy Nuclear Ops., Inc.*, 663 F.3d 556, 570 (2d Cir. 2011) ("[C]riticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action." (internal quotation marks omitted)).  Farooq's allegation that Farooqi "mocked his spelling errors" in an email that Farooq sent regarding mistreatment by a non-Pakistani colleague, *see* SAC ¶ 78, is similarly non-actionable, *see Weeks*, 273 F.3d at 85.

Whether some of Farooq's other allegations — namely, his allegation that he was assigned to be "Clinical Supervisor of the Day," SAC ¶ 93, and was suspended without pay — adequately plead materially adverse employment actions is a closer question, but the Court need not resolve it because Farooq fails to allege circumstances giving rise to an inference that these actions were the product of discrimination.  Farooq does not, for example, allege any direct evidence demonstrating discriminatory intent.  Instead, he relies almost entirely on an alleged pattern and practice of discriminatory conduct.  *See* Opp'n 15-16.  Setting aside the fact that the allegations supporting Farooq's argument on that score are, by and large, conclusory, the Second

14

Circuit has explicitly held that pattern-and-practice evidence, although useful, cannot make out a *prima facie* case by itself.  *See, e.g.*, *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 149 (2d Cir. 2012) ("To be sure, proof that an employer engaged in a pattern or practice of discrimination may be of substantial help in demonstrating an employer's liability in [an] individual case.  But such proof cannot relieve the plaintiff of the need to establish each element of his or her claim."); *Espinoza v. N.Y.C. Dep't of Transp.*, 304 F. Supp. 3d 374, 389 n.15 (S.D.N.Y. 2018) (holding that the plaintiff could not rely on a report regarding a pattern and practice of discrimination by the defendant "to provide an inference of discrimination for an individual disparate treatment claim — although evidence and statistics regarding past discrimination are heavily relied upon and are 'a mainstay of pattern or practice claims; the same is not true . . . of individual disparate treatment claims'" (quoting *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 77 (2d Cir. 2016)).

Nor does Farooq plausibly "demonstrate[e] that similarly situated employees" who are not Pakistani, Sunni Muslim, or roughly the same age, "were treated more favorably."  *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999).  "To be 'similarly situated,' the individuals with whom [a plaintiff] attempts to compare [him]self to must be similarly situated in all material respects."  *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997) (quoting *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir.1992)).  That means that Farooq must allege that similarly situated employees who engaged in conduct that bears a "reasonably close resemblance of the facts and circumstances of [the] plaintiff's . . . case[]" were not similarly disciplined.  *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000).  Farooq does not do so here.  Indeed, Farooq compares himself to other employees only once: He alleges that he "was asked to turn over his keys to the clinical pharmacist's shared office" but that "a non-Pakistani clinical pharmacist who, at the time, was far less senior" was not asked to do so.  SAC ¶ 41.  Even if that were a materially adverse employment action — another doubtful proposition

— the Complaint is devoid of the factual allegations that would enable the Court to infer that that comparator was similarly situated.

Farooq's failure to identify comparators, let alone to "provide any specificity as to [his] alleged comparators' qualifications, responsibilities, employment history, and the particulars of" their treatment "is fatal to [his] claims." *Adams-Flores v. City of New York*, No. 18-CV-12150 (JMF), 2020 WL 996421, at *5 (S.D.N.Y. Mar. 2, 2020) (internal quotation marks omitted); *see, e.g.*, *Hernandez v. Premium Merchant Funding One, LLC*, No. 19-CV-1727 (WHP), 2020 WL 3962108, at *9 (S.D.N.Y. July 13, 2020) (dismissing a Title VII claim because the plaintiff "fail[ed] to plead any additional facts to show that she was similarly situated to any of her male colleagues"); *Henderson v. Physician Affiliate Grp. of N.Y. P.C.*, No. 18-CV-3430 (JMF), 2019 WL 3778504, at *5 (S.D.N.Y. Aug. 12, 2019) (holding that the plaintiff's "failure to identify any particular comparators, combined with her failure to allege any facts to support her information-and-belief allegations that they were not subjected to the same negative treatment, precludes her from pleading upon information and belief that she was treated less favorably than other similarly situated employees" from outside of her protected class (alterations and internal quotation marks omitted)); *Dooley v. JetBlue Airways Corp.*, No. 14-CV-4432 (JMF), 2015 WL 1514955, at *3 (S.D.N.Y. Apr. 1, 2015) (dismissing discrimination claims where "there [was] no factual basis to conclude that the two [alleged] comparators [were] similarly situated," as the complaint "provide[d] no information about their tenure, rank, or performance evaluations within the company, and, perhaps most importantly, g[ave] no indication" that they engaged in conduct similar to the plaintiff), *aff'd in relevant part*, 636 F. App'x 16, 19-20 (2d Cir. 2015) (summary order); *Henry v. N.Y.C. Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 408 (S.D.N.Y. 2014) (dismissing a Title VII claim because the complaint "fail[ed] to describe who" the allegedly

similarly situated employees were, "what their responsibilities were, how their workplace conduct compared to [the plaintiff's], or how they were treated").

### 2. Hostile Work Environment

Next, Farooq asserts that Defendants created a hostile work environment on the basis of race, national origin, and religion, in violation of Title VII.  *See* SAC ¶¶ 127-30.  To prevail on a hostile work environment claim, a plaintiff must show that his or her "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012) (alterations and internal quotation marks omitted).  In determining whether such an environment exists, a court must consider "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (internal quotation marks omitted).  Further, "a plaintiff alleging a hostile work environment claim must also establish that 'the conduct at issue was not merely tinged with offensive connotations, but actually constituted *discrimination* because of'" race or another protected category.  *Browne v. City Univ. of N.Y.*, 419 F. Supp. 2d 315, 330 (E.D.N.Y. 2005) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 80-81 (1998)), *aff'd sub nom. Browne v. Queen's Coll. City Univ. of N.Y., Inc.*, 202 F. App'x 523 (2d Cir. 2006) (summary order).

Measured against those standards, Farooq's claim falls short.  Farooq makes only a handful of allegations in support of his claims for hostile work environment.  *See* SAC ¶¶ 76-86; Opp'n 19-20.  Many are his and his colleagues' subjective views of Farooqi's conduct.  *See, e.g.*, SAC ¶ 77 (alleging that Farooq "and his colleagues, many of whom speak English as a second

language, also feel bullied and intimidated" by Farooqi); *id.* ¶ 82 (alleging that most remaining
Pakistani pharmacists have filed complaints with the EEOC); *see also id.* ¶ 81 (alleging that "five
Pakistani pharmacists . . . have left or were forced into retirement").[3]  But because "a hostile
work environment claim has both objective and subjective prongs . . . the subjective belief of
[Farooq] and his co-workers that there was . . . discrimination afoot — however strongly felt —
is insufficient to satisfy his burden at the pleading stage."  *Lenart v. Coach Inc.*, 131 F. Supp. 3d
61, 68 (S.D.N.Y. 2015) (internal quotation marks omitted).

Farooq's other allegations do not push his claims over the plausibility line either.  For
instance, that Farooqi "forced" the former supervising pharmacist, a Pakistani man, to retire by
"hir[ing] new staff without [his] knowledge," SAC ¶ 87-88, does not suggest that the work
environment was "permeated with discriminatory intimidation, ridicule, and insult," *Redd*, 678
F.3d at 175.  And Farooq's allegation that Farooqi denied him and other Pakistani pharmacists
unidentified religious accommodations, *see* SAC ¶¶ 79-80, "are at most allegations in support of
an inference of discrimination, not examples of 'intimidation, ridicule, and insult' in support of a
claim for hostile work environment," *Goldschmidt v. N.Y. State Affordable Hous. Corp.*, 380 F.
Supp. 2d 303, 313 (S.D.N.Y. 2005) (Chin, J.).  That leaves only Farooq's conclusory allegation
that Farooqi is "very derogatory during her oral communications and uses abusive language,"
SAC ¶ 76, and a single example — that Farooqi once "mocked [Farooq's] spelling errors" in
response to an email regarding mistreatment by a non-Pakistani pharmacist, *id.* ¶ 78.  Even

---

[3]      Although the Court may take judicial notice of the lawsuits filed by Farooq's colleagues,
*see* Opp'n 20, it may not assume the facts alleged in their complaints to be true, *see Glob.
Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may
take judicial notice of a document filed in another court not for the truth of the matters asserted
in the other litigation, but rather to establish the fact of such litigation and related filings."
(internal quotation marks omitted)).  Accordingly, the lawsuits do no more than provide further
evidence of Farooq's colleagues' subjective perception of a hostile work environment.

considered together and in the light most favorable to Farooq, these facts are "neither severe nor pervasive enough to alter the conditions of his work environment." *Chukwueze v. NYCERS*, 891 F. Supp. 2d 443, 455 (S.D.N.Y. 2012).

In any event, Farooq does not adequately allege that he was disfavored *because* of his race, national origin, or religion. *See Lenart*, 131 F. Supp. 3d at 67 ("[T]here is nothing in the Complaint that plausibly suggests [that the plaintiff] was treated more favorably *because* of her gender."); *see also El v. N.Y. State Psychiatric Inst.*, No. 13-CV-6628 (WHP), 2014 WL 4229964, at *6 (S.D.N.Y. Aug. 19, 2014) ("Although El's EEOC charge claimed a particular nurse yells only at men and not at women, it only described one incident in which that person yelled at anyone.  This does not suggest an improper race- or gender-based motive.").  He does not even allege that the treatment was directed only at older Pakistani men.  *See Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002) ("Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude.  It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination.").  Nor does Farooq allege that any of Farooqi's comments concerned his race, national origin, or religion. Accordingly, Farooq's hostile work environment claims must be and are dismissed.

### 3.  Retaliation

Finally, Farooq asserts that Defendants retaliated against him for lodging a complaint about discriminatory practices in violation of Title VII.  *See* SAC ¶¶ 131-34.  Specifically, Farooq alleges that "a non-Pakistani man[] was named by Dr. Farooqi as Dr. Farooq's supervisor with the apparent mission of harassing him without basis."  *Id.* ¶ 92.  On May 8, 2019, Farooq's supervisor "chastised [him] for using sick days" that he was authorized to take, *id.* ¶ 92, and five days later, Farooq "was suddenly assigned as a 'Clinical Supervisor of the Day' once week in the

Inpatient Main Pharmacy," which "shifted his duties away from" critical care, *id.* ¶ 93.  In early June 2019, Farooq was asked to relinquish his keys to the shared office, *see id.* ¶ 41, and was given a written "counseling" notice for "unprofessional communication to administration," *id.* ¶ 42.  On June 21, 2019, Farooq was suspended, initially without pay. *See id.* ¶ 51.

To establish a *prima facie* case of retaliation under Title VII, "an employee must show (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005) (internal quotation marks omitted).  "[P]roof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. NYC Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).  Generally, "a close temporal relationship between a plaintiff's participation in protected activity and an employer's adverse actions can be sufficient to establish causation." *Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002).  But retaliation claims relying solely on temporal proximity to demonstrate a causal connection are difficult to prove and the temporal proximity must be "very close."  *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (internal quotation marks omitted).

Applying these standards here, the Court concludes that Farooq's retaliation claims must be dismissed.  The Complaint identifies only one protected activity — the filing of an internal complaint with H+H's EEO office in January 2019.  *See* SAC ¶ 63.[4]  But it fails to plausibly

---

[4]      Farooq alleges that "counsel for a number of the older Pakistani pharmacists sent a letter" to Carrington regarding Farooqi's discriminatory practices on April 30, 2019, but he

plead a causal connection between that complaint and Defendants' allegedly retaliatory acts, which occurred approximately five months later. Farooq does not claim, for instance, that any of the Defendants mentioned his or the others' complaints. Instead, he relies entirely on the temporal proximity between his protected activity and the adverse actions. *See* Opp'n 21-22. But the five-month gap here is "insufficient, standing alone, to establish a causal connection." *Chukwueze*, 891 F. Supp. 2d at 457; *see, e.g.*, *Jones v. N.Y.C. Bd. of Educ.*, No. 09-CV-4815 (RWS), 2012 WL 1116906, at *14 (S.D.N.Y. Apr. 2, 2012) ("District courts in this circuit consistently have found that an intervening period of more than two to three months is insufficient to establish a causal connection through temporal proximity alone."); *see also, e.g.*, *Murray v. Visiting Nurse Servs. of N.Y.*, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) (citing cases for the proposition that on summary judgment a gap of two or three months, without more, "does not allow for an inference of causation"); *Billue v. Praxair, Inc.*, No. 3:05-CV-170 (JCH), 2007 WL 1231841, at *8 (D. Conn. Apr. 26, 2007) (noting that courts in the Second Circuit "have rejected finding a causal inference when there were gaps of three months, six months, eight months, one year, and eleven months between the [protected activity] and the alleged retaliation").

Accordingly, Farooq's retaliation claims must be and are dismissed.

**D. State and Local Claims**

Having dismissed Farooq's federal claims, the Court must decide whether to exercise supplemental jurisdiction over his claims under state and local law. Pursuant to 28 U.S.C.

---

conspicuously does not allege that *he* was among those represented. *See id.* ¶ 65. Even in his opposition brief, Farooq carefully avoids associating himself with the April 30th letter. *See* Opp'n 21 (arguing that Farooq's "internal complaint *was followed* by *a* lawyer's letter on April 30, 2019" (emphasis added)).

§ 1367(c)(3), a district court "may decline to exercise supplemental jurisdiction over [a pendent state law claim] if . . . the district court has dismissed all claims over which it has original jurisdiction." The statute does not create "a mandatory rule to be applied inflexibly in all cases." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). Nevertheless, "in the usual case in which all federal-law claims are eliminated before trial," as here, "the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.*; *see also Kolari v. N.Y. Presbyterian Hosp.*, 455 F.3d 118, 123 (2d Cir. 2006) (reversing a district court decision to retain supplemental jurisdiction over state-law claims after dismissal of the federal claim, citing "the absence of a clearly articulated federal interest"); *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well."); *Anderson v. Nat'l Grid, PLC*, 93 F. Supp. 3d 120, 147 (E.D.N.Y. 2015) ("In the interest of comity, the Second Circuit instructs that absent exceptional circumstances, where federal claims can be disposed of pursuant to Rule 12(b)(6) or summary judgment grounds, courts should abstain from exercising pendent jurisdiction." (citing cases) (internal quotation marks omitted)).

Despite the general presumption, the Court concludes that, in the interest of judicial economy, it should exercise supplemental jurisdiction over any state and local claims governed by the same standards as Farooq's analogous federal claims. First, the Court exercises supplemental jurisdiction over Farooq's "free speech claim[] under Article I, Section 8 of the New York State Constitution" and holds that it must be dismissed, as such claims "are subject to the same analysis as free speech claims under the First Amendment." *Carter v. Inc. Vill. of Ocean Beach*, 693 F. Supp. 2d 203, 212 (E.D.N.Y. 2010), *aff'd* 415 F. App'x 290 (2d Cir. 2011) (summary order); *see also Housing Works, Inc. v. Turner*, 179 F. Supp. 2d 177, 199 n.25

(S.D.N.Y. 2001), *aff'd sub nom. Housing Works, Inc. v. Giuliani*, 56 F. App'x 530 (2d Cir. 2003) (summary order).  Second, there are no material differences, for purposes of this case, between the standards applicable to Farooq's claims under Title VII and the ADEA, on the one hand, and his claims under the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.*, on the other.  *See, e.g.*, *Leopold v. Baccarat, Inc.*, 174 F.3d 261, 264 n.1 (2d Cir. 1999) (disparate treatment); *Kelly v. Howard I. Shapiro & Assoc. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (retaliation); *Lenart*, 131 F. Supp. 3d at 66 (hostile work environment).  It would be inefficient, and risk inconsistency, to defer a decision on all these claims to a state court; instead, they are dismissed for the reasons set forth above.

By contrast, the Court declines to exercise supplemental jurisdiction over Farooq's claims under the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin Code §§ 8-101 *et seq.*, which are subject to a different standard and must be analyzed separately.  *See, e.g.*, *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (noting that NYCHRL claims "require[] an independent analysis").  In light of that, and because the law governing claims under the NYCHRL is still developing, Farooq's NYCHRL claims present questions "best left to the courts of the state of New York."  *Brief v. Albert Einstein Coll. Of Med.*, 423 F. App'x 88, 92-93 (2d Cir. 2011) (summary order) (affirming dismissal of the plaintiff's federal claims and declining to decide his claims under state and city law on the ground that they were "arguably governed by different legal standards" and the relevant law of New York was "still developing"); *Giordano v. City of New York*, 274 F.3d 740, 754 (2d Cir. 2001) (declining to reach the question of whether the plaintiff had a valid claim under the NYCHRL after dismissing his federal claim).  Additionally, "[t]he issues posed by" Farooq's claims under Section 75-b of the New York Civil Service Law and Section 12-113 of the Administrative Code of New York City "have no relation to federal law, but rather implicate

23

local governmental interests." *Healy v. City of New York Dep't of Sanitation*, 286 F. App'x 744, 746 (2d Cir. 2008) (summary order) (internal citations omitted).  Because the litigation is still in its early stages and there is a "paucity of state-court decisions construing § 12-113" in particular, *id.*, the general presumption in favor of declining supplemental jurisdiction applies with particular force to these claims.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED, and all of Farooq's federal claims, as well as his claims under the New York State Constitution and the NYSHRL, are dismissed with prejudice.  His remaining claims under state and local law are dismissed without prejudice to refiling them in state court.

The only remaining question is whether Farooq should be granted leave to amend. Although leave to amend a complaint should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), it is ultimately "within the sound discretion of the district court to grant or deny leave to amend," *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).  Here, Farooq does not request leave to amend, and the Court declines to grant him leave to amend *sua sponte*.  Farooq was previously granted leave to amend to cure the deficiencies raised in the present motion to dismiss — and expressly warned that he would "not be given any further opportunity to amend the complaint to address issues raised by the motion to dismiss."  ECF No 37; *see also* ECF No. 52.  Moreover, as noted, Farooq "has not requested permission to file a [Third] Amended Complaint."  *Clark v. Kitt*, No. 12-CV-8061 (CS), 2014 WL 4054284, at *15 (S.D.N.Y. Aug. 15, 2014).  Nor has he "given any indication that he is in possession of facts that would cure the problems" identified above.  *Id.*  At bottom, because Farooq's "failure to fix deficiencies in [his] previous pleadings is alone sufficient ground to deny leave to amend *sua*

*sponte*," the Court declines to grant such leave here.  *Transeo S.A.R.L. v. Bessemer Venture Partners VI L.P.*, 936 F. Supp. 2d 376, 415 (S.D.N.Y. 2013).

The Clerk of Court is directed to terminate Docket No. 57 and to close the case.

SO ORDERED.

Dated: August 25, 2020
       New York, New York

_____
JESSE M. FURMAN
United States District Judge

25